ADVISORY OPINION ON CONSTITUTIONALITY OF 1982 PA 47

Docket No. 69345. Argued March 8, 1983 (Calendar No. 5).—Decided
November 23, 1983.

The Supreme Court granted a request by the Legislature and the
Governor for an advisory opinion on the constitutionality of
1982 PA 47 (Enrolled House Bill 5313), which purported to
amend the water pollution control act, 1968 PA 76, to permit
the sale of general obligation bonds authorized by the act at a
rate of interest higher than the maximum rate originally
permitted under the authorization as it was approved by the
voters in 1968.

In an opinion by Justice Levin, joined by Justices Kavanagh,
Cavanagh, and Boyle, the Supreme Court advised:

The Legislature may, without voter approval, amend an act
authorizing the borrowing of money, such as 1968 PA 76, which
was approved by 2/3 of the members of each house and was
submitted to and approved by the voters unless the amendment
relates to the amount to be borrowed, the specific purpose to
which the funds are to be devoted, or the method of repayment.
1982 PA 47 amended only the rate of interest, which is not one
of the three particulars of a long-term borrowing required by
the constitution to be stated in a ballot question, and it is
therefore constitutional.

1. The state may borrow money for specific purposes in
amounts provided by acts adopted by 2/3 of each house of the
Legislature and approved by a majority of the voters at a

REFERENCES FOR POINTS IN HEADNOTES

[1, 10, 11] 64 Am Jur 2d, Public Securities and Obligations § 151 *et
seq.*
72 Am Jur 2d, States, Territories, and Dependencies § 41.
[2] 64 Am Jur 2d, Public Securities and Obligations § 137.
[3] 64 Am Jur 2d, Public Securities and Obligations § 185.
[4] 73 Am Jur 2d, Statutes §§ 34, 57.
[5] 16 Am Jur 2d, Constitutional Law §§ 31, 44.
[6, 9, 12] 64 Am Jur 2d, Public Securities and Obligations § 132.
[7] 16 Am Jur 2d, Constitutional Law § 216.
16A Am Jur 2d, Constitutional Law § 818.
[8] 64 Am Jur 2d, Public Securities and Obligations §§ 173, 174, 455.

general election. The question presented to the voters on the ballot must indicate the amount to be borrowed, the specific purpose to which the funds will be devoted, and the method of repayment. The rate of interest on the amount borrowed need not be stated, and no rate of interest to be paid on the funds borrowed was stated in the question presented in 1968. By affirmatively answering the ballot question, the people approved the borrowing of a principal amount. The rate of interest, not having been stated in the ballot question, was not voted on.

2. Even if the voters are deemed to have approved 1968 PA 76 as a "whole", and not just the borrowing, or the amount to be borrowed, the specific purpose to which the funds are to be devoted, and the method of repayment, it does not follow that the voters must approve a change in particulars included in that act other than the three particulars required by the constitution to be stated in the ballot question. An act adopted with the approval of the voters is generally subject to amendment by the Legislature without voter approval, subject to explicit and implicit constitutional limitations. Voter approval of a legislative amendment of voter-approved legislation is not required unless it relates to a provision that the Legislature is not empowered to enact without voter approval. There is no reason to infer a constitutional limitation to guard against legislative action in an area in which the Legislature has the authority to legislate without an approving vote of the people. To so infer would prevent the Legislature from doing directly what it can do indirectly.

3. The Constitution of 1908 generally precluded the state from borrowing money. As a result, amendment of the constitution was necessary to authorize long-term borrowing. Article 9, § 15 of the Constitution of 1963 was designed to eliminate the need for amendments to authorize long-term borrowing. The Constitution of 1908 and the amendments authorizing long-term borrowing did not state a rate of interest to be paid on the funds borrowed. The Constitution of 1963, in not requiring a statement of a rate of interest as one of the particulars of borrowing to be included in a ballot question, is consistent with the practice preceding its adoption and with the intention of simplifying the procedures for authorizing long-term borrowing, while preserving the control voters were able to exercise under the Constitution of 1908. A long-term borrowing act, although requiring an affirmative vote by 2/3 of the members of each house of the Legislature and by a majority of the voters on a ballot question to become effective, does not become a constitu-

tional amendment upon approval of the voters. Nor does the act have the status of a constitutional amendment. To advise otherwise is to reintroduce the rigidity that Article 9, § 15 of the Constitution of 1963 sought to avoid.

4. The requirement that the amount to be borrowed and the method of repayment be included in a ballot question does not require that an interest rate or the amount of interest to be paid on the principal amount borrowed be stated. An interest rate is not an "amount to be borrowed". The term "method of repayment" refers generally to the source of repayment. As set forth in the ballot question seeking authorization of the amount to be borrowed under 1968 PA 76, the source of repayment is the general fund of the state. 1982 PA 47 amended only the rate of interest provided in 1968 PA 76, and was not a new debt authorization.

5. To bar the marketing of the remaining water pollution bonds authorized under 1968 PA 76 because that act prescribed a rate of interest amended by 1982 PA 47 without voter approval would not protect the people from a change in the interest rate applied to long-term borrowing in the future. The Legislature simply could fail to prescribe a rate of interest when submitting long-term bond legislation to the voters and provide later, in a separate act, for a rate of interest and other particulars not required to be stated in the ballot question, thereby avoiding any inhibition on its power to set rates of interest. Only a constitutional amendment reserving to the people the power to approve the rate of interest of long-term borrowing along with the other three particulars of borrowing set forth in the constitution would preclude legislative amendment of the rate of interest without voter approval.

Chief Justice Williams, joined by Justices Ryan and Brickley, would advise that 1982 PA 47 is unconstitutional because it attempted to amend a long-term borrowing authorization approved by the voters without submitting the amendment to the electorate for approval as required by the constitution.

1. The Constitution of Michigan is not a grant of power to the Legislature as is the Constitution of the United States. Rather, it is a limitation on general legislative power. Acts of the Legislature are presumed constitutional unless they manifestly infringe upon some provision of the constitution.

2. The power of the state to borrow money is limited under the constitution to specific purposes in amounts as provided by acts adopted by 2/3 of each house of the Legislature and approved by a majority of the electors at a general election. The Legislature is not permitted to incur long-term debt with-

out approval of the people; likewise, analysis of the language of the constitution and the history of the constitutional convention show that it was intended that the Legislature may not amend a previous long-term debt authorization without voter approval.

3. The voters, in approving the water pollution control act, approved the whole act and not merely the provisions set forth in the ballot question. It is the act, not the question, which authorizes the borrowing. The main objective of the ballot question is to apprise the voters generally of the subject matter of the act; it need not contain all the details. The rate of interest to be paid on the general obligation bonds authorized by the act, while not specifically set forth in the ballot question, was part of the act and was approved by the voters.

OPINION OF THE COURT

1. CONSTITUTIONAL LAW — LONG-TERM BORROWING — LIMITATIONS — VOTER APPROVAL — INTEREST RATE.

The state may borrow money for specific purposes in amounts provided by acts adopted by 2/3 of each house of the Legislature and approved by a majority of the voters at a general election; the question presented to the voters on the ballot seeking approval of the borrowing must state the amount to be borrowed, the specific purpose to which the funds will be devoted, and the method of repayment, but the rate of interest on the amount to be borrowed need not be stated (Const 1963, art 9, § 15).

2. CONSTITUTIONAL LAW — LONG-TERM BORROWING — LIMITATIONS.

The Legislature may, without voter approval, amend an act authorizing long-term borrowing by the state which was approved by 2/3 of the members of each house and submitted to and approved by the voters so long as the amendment does not relate to the amount to be borrowed, the specific purpose to which the funds are to be devoted, or the method of repayment (Const 1963, art 9, § 15).

3. CONSTITUTIONAL LAW — LONG-TERM BORROWING — LIMITATIONS — VOTER APPROVAL.

The voters, in affirmatively answering the ballot question seeking authorization of borrowing under 1968 PA 76, approved the borrowing of a principal amount for a specific purpose to be repaid in a particular manner; because no rate of interest to be paid on the principal amount was stated in the ballot question,

the rate of interest provided in 1968 PA 76 was not approved by the voters (Const 1963, art 9, § 15; MCL 323.371 *et seq.;* MSA 5.2769[201] *et seq.).*

4. CONSTITUTIONAL LAW — STATUTES — AMENDMENT — VOTER APPROVAL.

An act adopted with the approval of the voters is generally subject to amendment by the Legislature without voter approval, subject to explicit and implicit constitutional limitations; voter approval of a legislative amendment of voter-approved legislation is not required unless it relates to a provision that the Legislature is not empowered to enact without voter approval.

5. CONSTITUTIONAL LAW — LONG-TERM BORROWING — LIMITATIONS — VOTER APPROVAL.

A long-term borrowing act, although requiring an affirmative vote by 2/3 of the members of each house of the Legislature and by a majority of the voters on a ballot question to become effective, does not become a constitutional amendment upon approval of the voters; nor does the act have the status of a constitutional amendment.

6. CONSTITUTIONAL LAW — LONG-TERM BORROWING — INTEREST RATE — VOTER APPROVAL.

1982 PA 47, which amended the interest ceiling of general obligation bonds authorized by the water pollution control act, did not require voter approval to become effective and was constitutional (Const 1963, art 9, § 15; MCL 323.374; MSA 5.2769[204]).

OPINION BY WILLIAMS, C.J.

7. CONSTITUTIONAL LAW — LEGISLATURE — LIMITATIONS.

*The Constitution of Michigan is not a grant of power to the Legislature as is the Constitution of the United States; rather, it is a limitation on general legislative power, and acts of the Legislature are presumed constitutional unless they manifestly infringe upon some provision of the constitution.*

8. CONSTITUTIONAL LAW — LONG-TERM BORROWING — LIMITATIONS.

*The power of the state to borrow money is limited under the constitution to specific purposes in amounts as provided by acts adopted by 2/3 of each house of the Legislature and approved by a majority of the electors at a general election (Const 1963, art 9, §§ 12, 15).*

9. CONSTITUTIONAL LAW — LONG-TERM BORROWING — LIMITATIONS — VOTER APPROVAL.

   *The Legislature may not incur long-term debt without approval of the electorate, nor may it amend a long-term debt previously authorized by the voters without voter approval (Const 1963, art 9, § 15).*

10. CONSTITUTIONAL LAW — LONG-TERM BORROWING — LIMITATIONS — VOTER APPROVAL.

   *Approval by the electorate in a general election of an act adopted by 2/3 of each house of the Legislature which authorizes the borrowing of a specific amount of money by the state is an approval of the entire act even though the question presented on the ballot did not include the text of the entire act (Const 1963, art 9, §§ 12, 15; MCL 168.643a; MSA 6.1643[1]).*

11. ELECTIONS — BALLOT PROPOSALS — FORM.

   *A question submitted to the electors of the state should generally apprise them of the subject matter of the proposal or issue; it need not contain all the details of the proposal nor be legally precise (MCL 168.643a; MSA 6.1643[1]).*

12. CONSTITUTIONAL LAW — LONG-TERM BORROWING — LIMITATIONS — VOTER APPROVAL.

   *1982 PA 47, which attempted to amend the voter-approved borrowing authorization of the water pollution control act by raising the interest ceiling of general obligation bonds without obtaining voter approval was unconstitutional (Const 1963, art 9, § 15; MCL 323.371 et seq.; MSA 5.2769[201] et seq.).*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Milton I. Firestone* and *Florence E. Fraser,* Assistants Attorney General, in support of constitutionality, and

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Michael J. Moquin,* Assistant Attorney General, in opposition to constitutionality.

Amici Curiae:

*Miller, Canfield, Paddock & Stone* (by *Stratton S. Brown* and *Cynthia B. Faulhaber)* for the cities

of Battle Creek, Detroit, Kalamazoo, and Lapeer, and the Port Austin Area Sewer & Water Authority.

*J. Brian Raymond* for State Representatives Bobby D. Crim, William A. Ryan, Thomas J. Anderson, and Robert Emerson.

LEVIN, J. Section 15 of the finance and taxation article of the constitution provides that the state may borrow money for specific purposes in amounts provided by acts adopted on a two-thirds vote of each house of the Legislature and approved by a majority of the electors at a general election. Section 15 provides that the ballot question shall state "the amount to be borrowed, the specific purpose to which the funds shall be devoted, and the method of repayment".[1]

Pursuant to § 15 and 1968 PA 76, the three-part question mandated by § 15—shall the state borrow $335 million and issue general obligation (full faith and credit) bonds to be repaid from the general fund of the state, the proceeds to be used for water pollution prevention and abatement facilities[2]—was submitted to and answered affirma-

---

[1] "The state may borrow money for specific purposes in amounts as may be provided by acts of the legislature adopted by a vote of two-thirds of the members elected to and serving in each house, and approved by a majority of the electors voting thereon at any general election. The question submitted to the electors shall state the amount to be borrowed, the specific purpose to which the funds shall be devoted, and the method of repayment." Const 1963, art 9, § 15.

[2] The question was set forth in § 8 of Act 76, MCL 323.378; MSA 5.2769(208), and read as follows:

"Shall the state of Michigan borrow the sum of $335,000,000.00 and issue general obligation bonds of the state therefor pledging the full faith and credit of the state for the payment of principal and interest thereon for the purpose of planning, acquiring and constructing facilities for the prevention and abatement of water pollution and for the making of grants, loans and advances to municipalities, political subdivisions and agencies of the state for such purposes, the method of repayment of said bonds to be from the general fund of the state?

Yes ☐
No ☐"

tively by a majority of the voters at the 1968 general election.[3]

Act 76 provided that the bonds shall be issued in one or more series.[4] Bonds aggregating $302 million were issued in seven series on various dates during the four-year period of 1969 through 1972.

Act 76 provided that the bonds should bear interest at a rate not exceeding 6% per annum.[5] 1982 PA 47 amended Act 76 to provide that the interest rate of bonds issued after the effective date of amendatory Act 47 should not exceed 18% per annum.[6]

This Court granted a request for an advisory opinion on the question whether the state may issue the remaining $33 million of general obligation bonds authorized by Act 76 "at a rate of interest higher than the 6% authorized in" Act 76.[7]

The opinion of the justices advising that a vote

---

[3] 1969-1970 Michigan Manual, p 496.

[4] MCL 323.374; MSA 5.2769(204).

[5] MCL 323.374; MSA 5.2769(204).

[6] "The bonds shall be issued in 1 or more series, each series to be in such principal amount, to be dated, to have such maturities which may be either serial, term, or term and serial, to bear interest at such rate or rates, not to exceed 6% per annum if issued before the effective date of this amendatory act, and not to exceed 18% per annum if issued on or after the effective date of this amendatory act, to be subject or not subject to prior redemption and if subject to prior redemption with such call premiums, to be payable at such place or places, to have or have not such provisions for registration as to principal only or as to both principal and interest, to be in such form and to be executed in such manner as shall be determined by resolution to be adopted by the administrative board." MCL 323.374; MSA 5.2769(204).

1981 PA 69 amended Act 76 to provide that the interest rate shall not exceed the maximum rate permitted by 1943 PA 202 as amended. The language added in 1981 was eliminated by the substitute language of 1982 PA 47.

[7] This Court originally declined to grant the request, but the request was granted on reconsideration. 413 Mich 1107.

of the people is required to amend the interest rate and that Act 47 is unconstitutional stresses that although the Legislature "might have enacted a bill without a set interest rate", Act 76 set an interest rate. The opinion concludes that "the people approved the whole of 1968 PA 76",[8] that is, including the interest rate, and that "[u]nder the debt-control limitations of the constitution, the Legislature, by itself, cannot change that which the voters have approved".[9]

We advise that Act 47, "presumed constitutional until the contrary is shown",[10] is constitutional. The people, in answering in the affirmative the three-part ballot question on Act 76, approved the borrowing, or the three particulars of the borrowing required by art 9, § 15 to be set forth in the ballot question, and not the whole act. Further, even if the people are deemed to have approved the whole act, the Legislature may nevertheless amend without voter approval an act authorizing long-term borrowing unless the amendment relates to one or more of the three particulars (the amount to be borrowed, the specific purpose to which the funds shall be devoted, or the method of repayment) identified in § 15. Act 47 (the 1982 amendment of Act 76) concerns a particular of long-term borrowing (the interest rate) not required by § 15 to be stated in a ballot question. The remaining $33 million of general obligation

[8] *Post,* p 89.

[9] *Post,* p 93.

The brief of the Attorney General in opposition to constitutionality similarly states that "it is logical to conclude that the constitutional status of a voter-approved long-term borrowing act shall not be modified unless the Legislature and the people specifically so provide."

[10] *Sears v Cottrell,* 5 Mich 251, 259 (1858), quoted approvingly in *Johnson v Comm'r of Agriculture,* 314 Mich 548, 557; 22 NW2d 893 (1946).

bonds may, consistent with § 15, be sold at an interest rate higher than the 6% authorized by Act 76 before it was amended by Act 47.

I

Section 15 of the 1963 Constitution was a new provision. The state was, for all practical purposes, precluded from borrowing money by the 1908 Constitution.[11] A constitutional amendment, initiated by the people or proposed by two-thirds of the members of both houses of the Legislature and approved by a majority of the voters,[12] was required to authorize long-term borrowing. The 1908 Constitution was amended nine times to authorize long-term borrowing in stated amounts for specific purposes.[13]

---

[11] As originally adopted, Const 1908, art 10, § 10 read as follows:

"The State may contract debts to meet deficits in revenue, but such debts shall not in the aggregate at any time exceed two hundred fifty thousand dollars. The State may also contract debts to repel invasion, suppress insurrection, defend the State or aid the United States in time of war. The money so raised shall be applied to the purposes for which it is raised or to the payment of the debts contracted."

[12] Const 1908, art 17, §§ 1 and 2.

[13] 1919 Joint Resolution No 1, ratified at the election of April, 1919, amended Const 1908, art 10, § 10 to authorize borrowing of $50 million for the improvement of highways; 1917 Joint Resolution No 3, ratified at the election of April, 1917, added § 20 to art 10, authorizing the state to acquire railroad property and to assume debts or obligations in respect thereto; 1921 Joint Resolution No 1, ratified at the election of April, 1921, added § 20[a] to art 10, authorizing the state to borrow $30 million for the purpose of paying a bonus for veterans who served in World War I; 1946 (2nd Extra Session) Joint Resolution No 1, ratified at the election of November 5, 1946, added § 23[a] to art 10, authorizing the state to borrow $270 million to pay a bonus for veterans who served in World War II; 1950 (Extra Session) Joint Resolution No 1, ratified at the election of November 7, 1950, added § 24 to art 10, authorizing the state to borrow $65 million for certain hospitals and training schools; 1951 Joint Resolution No 2, ratified at the election of April 2, 1951, added § 25 to art 10, authorizing the state to use money authorized to be borrowed under § 23 to pay a bonus for survivors and dependents of veterans who served in the Korean conflict; 1954 Joint Resolution No 2, ratified at the election of November 2, 1954, added § 26 to art 10, authorizing the state to

It was not the practice, with regard to long-term borrowing under Article 10 of the 1908 Constitution, to obtain voter approval of an interest rate. None of the nine amendments of Article 10 stated an interest rate.[14]

Section 15 was designed to eliminate the "cluttering up" of the 1963 Constitution with constitutional amendments authorizing specific long-term borrowings, but to continue to require approval of long-term borrowing by two-thirds of the members of both houses of the Legislature and by a majority of the voters.[15] In not requiring a statement of the interest rate in the ballot question, § 15 is consistent with the practice preceding adoption of the 1963 Constitution and with its purpose of simplifying the procedures for authorizing long-term borrowing while preserving to the voters the control of long-term borrowing that they exercised under the 1908 Constitution. To hold that the establishment of an interest rate requires voter approval would make long-term borrowing procedures under the 1963 Constitution more restrictive than those under the 1908 Constitution in contravention of § 15's purpose of simplifying procedures.

borrow $80 million to pay a bonus for service in the Korean conflict; 1955 Joint Resolution No 3, ratified at the election of April 4, 1955, added § 27 to art 10, authorizing the state to borrow $100 million for the purpose of making loans to school districts; 1960 Joint Resolution No 1, ratified at the election of November 8, 1960, added § 28 to art 10, authorizing the state to borrow money for the purpose of making loans to school districts.

[14] The amendment of § 10 of art 10 and the amendment adding § 24 to art 10 authorized the Legislature to borrow the money "on such terms as shall be provided by law". The amendments adding §§ 23[a] and 26 authorized the Legislature to provide for borrowing the money "at the lowest possible cost". The amendment adding § 26 authorized the state administrative board to provide for borrowing "at the lowest possible cost".

The amendments adding §§ 20[a] and 27 authorized the borrowing of money on the faith and credit of the state, but did not prescribe, or confer authority to prescribe, the terms or manner of such borrowing.

[15] 2 Official Record, Constitutional Convention 1961, p 3401.

## II

Section 15 provides that a "question" shall be submitted to the voters. It does not state that the voters shall approve the act (or the whole act) or that the question to be submitted to the voters is whether they approve the act. Consistent with § 15, the question submitted to the voters pursuant to Act 76 did not ask whether they approved that act, but whether they approved the borrowing, or the three particulars of the borrowing stated in the question. When the voters answered the "question" affirmatively, they indicated approval of the borrowing, or the three particulars of the borrowing so stated, and Act 76 thereupon became effective.[16]

Absent a clear constitutional prohibition, this Court should not block the borrowing of the remaining $33 million principal amount approved by the Legislature and the people.

### A

Section 15 does not state precisely whether voter approval, evidenced by affirmative answer on a ballot question, means that the voters have approved (i) the borrowing, or the three particulars of the borrowing required by § 15 to be set forth in the ballot question, or (ii) the "whole act", including whatever other provisions may be there set forth in addition to those three particulars. Either construction of § 15 is arguably correct.[17]

---

[16] Section 11 (MCL 323.381; MSA 5.2769[211]) of Act 76 provides that no bonds shall be issued, and § 12 (MCL 323.382; MSA 5.2769[212]) provides that the act shall not become finally effective unless "the question set forth in section 8" is approved by a majority of the electors.

[17] The first construction of § 15 might be presented as follows:

"The state may borrow money for specific purposes in amounts as may be

"(a) provided by acts of the legislature adopted by a vote of two-thirds of the members elected to and serving in each house; and

The first construction is, in our opinion, preferable. It does not impute to the voters approval of provisions of a long-term borrowing act of which the ballot question does not inform the voters. It does not enlarge the answer of the voters beyond the question propounded to them.

The ballot question asked whether the people approved the borrowing of "the sum of $335,000,-000". Nothing was said in the ballot question about borrowing interest; the state did not borrow the interest it would obligate itself to pay on the principal amount it actually borrowed. Nor did the ballot question state the interest rate; § 15 does not require that it be stated.

By affirmatively answering the ballot question, the people approved the borrowing of the principal amount of $335 million. The interest required to be paid on the principal amount actually borrowed was not borrowed; the principal, not the interest, was borrowed.

### B

In *Miller v Ayres*, 211 Va 69; 175 SE2d 253 (1970), and *Louthan v King County*, 94 Wash 2d 422; 617 P2d 977 (1980), relied on in the opinion advising that Act 47 is unconstitutional, the legis-

"(b) approved by a majority of the electors voting thereon at any general election."

The second construction of § 15 is presented in the opinion of the justices advising that Act 47 is unconstitutional as follows:

"The state may borrow money for specific purposes in amounts as may be provided by acts of the legislature

"(a) adopted by a vote of two-thirds of the members elected to and serving in each house; and

"(b) approved by a majority of the electors voting thereon at any general election." *Post*, p 89.

The official convention comment lends some support to the second construction; it states that a bill authorizing long-term borrowing "will not be effective unless and until approved by a majority of the people who vote on the proposition". 2 Official Record, Constitutional Convention 1961, p 3401.

latures of Virginia and Washington increased the maximum interest rates prescribed by statute for local bond issues. The supreme courts of those states attributed to city and county voters who had voted in local bond issue elections presumptive knowledge of the maximum interest rate prescribed by state statute.[18] Without considering the precedents (Part III) which hold that a legislature has the power, without further voter approval, to amend voter-approved legislation, those courts concluded that additional series of local bond issues, which had been approved by the voters before the increase in the maximum interest rate, could not be issued at the higher rate without again submitting the question whether the bonds should be issued to the voters of the local governmental unit.

The Michigan Constitution, in contrast with the constitutions of Virginia and Washington, mandates the form of the ballot question, thereby prescribing the substantive provisions of bond legislation that must be submitted for voter approval. An interest rate is not a substantive provision required by the Michigan Constitution to be submitted.

If the reasoning of the Virginia and Washington

---

[18] Section 9 of the act (MCL 323.379; MSA 5.2769[209]) provides that the Secretary of State "shall take such steps and perform all acts as are necessary to properly submit [the] question to the electors" at the 1968 general election.

The Secretary of State provided copies of Act 76 to the county clerks in addition to the text of the question required to be propounded by § 15 of Article 9 and by § 8 of Act 76. Copies of the full text of Act 76 were posted as a wall plaque at the voting precincts during the 1968 general election pursuant to § 480 of the Election Law, MCL 168.480; MSA 6.1480, which had not been amended following the adoption of the 1963 Constitution.

The voters who may have become informed about the text of Act 76 and the provision of that act setting a 6% interest rate, either through reading the wall plaque or in some other manner, did not thereby obtain interests deserving constitutional protection which those who did not read or become so informed do not have.

courts were to be incorporated into the jurisprudence of this state, it would raise serious questions concerning the power of the Legislature. It is customary to provide that voter-approved bonds may be issued in series over a period of years as the money is needed. There are many statutory provisions concerning bond issues; the Legislature may find it necessary from time to time to amend such statutory provisions in light of changed circumstances.[19] A decision of this Court advising that the voters are presumed to know all the provisions of all those statutes and that the Legislature may not, insofar as indebtedness subject to "debt-control limitations" of the constitution is concerned, change "that which the voters have approved", would improperly cast doubt on the validity of all amendatory legislation and is contrary to the spirit of the Michigan Constitution, which reserves to the Legislature the power to amend voter-approved legislation without voter approval. See Part III.

## C

If this Court were to advise that the provisions of Act 47 (amending the interest rate of Act 76) cannot become effective without a vote of the people pursuant to § 15,[20] the ballot question for a vote on those provisions would, like the ballot question on Act 76, submitted to the people in 1968, state the amount, specific purpose, and method of repayment. Neither the interest rate nor the change in Act 76 effected by Act 47 would, under § 15, be stated.

The question that would be asked in respect to the provisions of Act 47, pursuant to § 15, would

---

[19] See fn 43 and accompanying text.

[20] Act 47 was not approved by the requisite two-thirds vote that would authorize submission to the voters pursuant to § 15.

thus be the same question already asked and
answered affirmatively in respect to Act 76: shall
the state borrow $33 million for the purpose and
with the method of repayment described in the
1968 ballot question?[21] The voters would be no
better informed by a ballot question, pursuant to
§ 15, on the provisions of Act 47 about the interest
rate of Act 76 of the change in interest rate ceiling
enacted by Act 47 than they were by the ballot
question on Act 76.

### III

Even if the voters are deemed to have approved
Act 76 as a "whole", and not just the borrowing,
or the three particulars of the borrowing required
to be set forth in the ballot question, it does not
follow that the voters must approve a change in
particulars included in that act other than the
three particulars required by the constitution.

An act adopted with the approval of the voters
is generally subject to amendment by the Legisla-
ture without voter approval, subject to explicit and
implicit constitutional limitations. Voter approval
of a legislative amendment of voter-approved legis-
lation is not required unless it relates to a provi-
sion that the Legislature is not empowered to
enact without voter approval. There is no reason
to infer a constitutional limitation to guard
against legislative action in an area in which the

---

[21] A long-term borrowing act might prescribe, as did Act 76 (see fn
2), the form of the ballot question. A legislatively prescribed ballot
question might provide information in addition to the three particu-
lars required by § 15. The wisdom or constitutionality of a ballot
question providing information in addition to that required by § 15 is
debatable. What is entirely clear, however, is that a ballot question
complies with § 15 if it contains the information prescribed by § 15,
and that this Court does not have the prerogative of requiring that
the ballot question contain information in addition to that required
by § 15.

Legislature has the authority to legislate without an approving vote of the people.

## A

An underlying premise of the opinion of the justices advising that Act 47 is unconstitutional is expressed in the statement that "[u]nder the debt-control limitations of the constitution, the Legislature, by itself, cannot change that which the voters approved."[22] An act of the Legislature approved by the voters is, however, generally regarded as subject to amendment by the Legislature without a vote of the people. *Chattanooga-Hamilton County Hospital Authority v City of Chattanooga,* 580 SW2d 322 (Tenn, 1979); *Jones v Maine State Highway Comm,* 238 A2d 226 (Me, 1968); *Cottingham v State Board of Examiners,* 134 Mont 1, 12; 328 P2d 907 (1958); *Adams v Bolin,* 74 Ariz 269, 276; 247 P2d 617 (1952); *Luker v Curtis,* 64 Idaho 703, 706; 136 P2d 978 (1943); *State ex rel Pierce v Slusher,* 119 Or 141, 147; 248 P 358 (1926); *State ex rel Richards v Whisman,* 36 SD 260, 269; 154 NW 707 (1915); *Waugh v Glos,* 246 Ill 604, 607; 92 NE 974 (1910).[23]

---

[22] *Post,* p 93.

[23] See generally Anno: *Power of legislative body to amend, repeal, or abrogate initiative or referendum measure, or to enact measure defeated on referendum,* 33 ALR2d 1118; 42 Am Jur 2d, Initiative and Referendum, § 58, p 707; 82 CJS, Statutes, § 150, p 254.

In *Arkansas Game & Fish Comm v Edgmon,* 218 Ark 207; 235 SW2d 554 (1951), the Supreme Court of Arkansas said that although constitutional amendments were within the literal definition of the term "measure" and although a measure was subject to amendment or repeal by a super-majority of the general assembly or of the city council, as the case may be, it was inconceivable that in defining a constitutional amendment as a "measure" it was intended to invest the general assembly with power to repeal or amend a constitutional amendment.

The cases are divided on whether the legislative body of a city may amend voter-approved legislation. In *State ex rel Singer v Cartledge,* 129 Ohio 279; 195 NE 237 (1935), the court held that the legislative body of a city was so empowered. In *State ex rel Ausburn v City of*

The courts have reasoned that the legislative power retained by the people, through the initiative and referendum, does not give any more force or effect to voter-approved legislation than to legislative acts not so approved. Voter-approved acts are "on an equal footing"[24] with legislation that has not been submitted to the people. Approval by the voters does not " 'lessen the power of the legislature' "; the initiative and referendum merely take " 'from the legislature the exclusive right to enact laws, at the same time leaving it a co-ordinate legislative body with them [the people]' ".[25] Some courts have reasoned that experience after the enactment of voter-approved legislation might indicate that legislation was not worka-

_Seattle,_ 190 Wash 222, 228; 67 P2d 913 (1937), and _Allen v Hollingsworth,_ 246 Ky 812; 56 SW2d 530 (1933), the court held that the legislative body of a city was not.

[24] _Luker v Curtis,_ 64 Idaho 703, 706-707; 136 P2d 978 (1943), where the Supreme Court of Idaho said:

"This power of legislation, reclaimed by the people through the medium of the amendment to the constitution, did not give any more force or effect to initiative legislation than to legislative acts but placed them on an equal footing. The power to thus legislate is derived from the same source and, when exercised through one method of legislation, it is asserted, is just as binding and efficient as if accomplished by the other method; that the legislative will and result is as validly consummated the one way as the other.

"It is contended, however, that the legislature has no power or authority to amend or repeal an initiative act, for the alleged reason that an initiative act comes directly from the people. That may very well be answered by the fact, that the legislators, who convene on the first Monday of January, following adoption of initiative measures, also come direct from the people, having been elected at the same time and by the same electors who adopted the initiative measure. If the legislature repeals or amends an initiative act, the people have at least two remedies, both of which they may exercise at the same time, to redress their grievance, if indeed, they have a grievance, over the act of the legislature: First, they may reenact the measure by another initiative and, second, at the same time and at the same election, may elect other members of the legislature who will, or may, better heed their wishes."

[25] _State ex rel Pierce v Slusher,_ 119 Or 141, 146-147; 248 P 358 (1926), quoting from _Straw v Harris,_ 54 Or 424, 431; 103 P 777 (1909); _Chattanooga-Hamilton County Hospital Authority v City of Chattanooga,_ 580 SW2d 322 (Tenn, 1979).

ble and that in providing for the initiative and
referendum the people intended that the Legisla-
ture possess the power to make needed changes as
otherwise there would be no means of doing so
before the next election.[26] It has been said by some
courts that if the people disagree with a legislative
amendment of voter-approved legislation their
remedies are the (or another) referendum and,
when the Legislature stands for re-election, the
ballot.[27]

Our research has failed to disclose a single
decision of an appellate court holding, upon consid-
eration of the authorities addressing the question,
that a state legislature is not empowered to amend
legislation approved by the voters in a statewide
election without a further submission to the voters
in another statewide election. In *Dykstra v
Holden,* 151 Mich 289, 291; 115 NW 74 (1908), this
Court held that where the Legislature had, before
express authorization in the 1908 Constitution,[28]
provided that a local act of 1903 should be submit-
ted to the people of a city before it became opera-
tive, the Legislature could amend the 1903 act
without resubmission to the people of that city.[29]

---

[26] See *Luker v Curtis, supra; State v Whisman,* 36 SD 260, 271; 154
NW 707 (1915).

[27] *Luker v Curtis, supra; Adams v Bolin,* 74 Ariz 269, 276; 247 P2d
617 (1952).

[28] "Any bill passed by the legislature and approved by the governor,
except a bill appropriating money, may provide that it will not
become law unless approved by a majority of the electors voting
thereon." Const 1963, art 4, § 34.

The 1908 Constitution contained a similar provision, Const 1908,
art 5, § 38, but the 1850 Constitution did not.

[29] There was, said the Court, nothing in the amendatory act "to
indicate that it was to be submitted to the people. On the contrary,
the legislative intent that it should become a law in the usual manner
is clearly indicated." *Dykstra v Holden,* 151 Mich 289, 291; 115 NW
74 (1908).

B

The opinion advising that Act 76 is unconstitutional does not consider the decisions in this and other jurisdictions holding that voter-approved legislation is subject to amendment by the Legislature without a vote of the people. The opinion cites *Miller v Ayres, supra,* and *Louthan v King County, supra,*[30] where the courts similarly did not consider the precedents holding that the Legislature has the power without voter approval to amend voter-approved legislation. *Miller* and *Louthan* were decided in constitutional contexts substantially different from those that govern in Michigan.[31]

The Constitution of Virginia *(Miller)* did not and does not provide for statewide initiative or referendum. The Supreme Court of Virginia therefore had no need to consider the possible effect of its decision on the general power of the Legislature to amend legislation approved by the voters in a statewide election. This Court, however, should consider the implications of its decision in the instant case on the power of the Legislature to amend legislation and provisions of legislation approved by the voters.

The Constitution of Washington *(Louthan)* provides that "[n]o act, law, or bill approved by a majority of the electors voting thereon shall be amended or repealed by the legislature within a period of two years following such enactment".[32]

---

[30] *Louthan* was decided by order, without the discipline of a reasoned opinion accompanying the order. The opinion reasoning to the conclusion already announced was not issued until four months after the order. See *United States v Forness,* 125 F2d 928, 942 (CA 2, 1942); Leflar, *Some Observations Concerning Judicial Opinions,* 61 Colum L Rev 810 (1961).

[31] In both cases, the Courts were considering legislative amendments affecting borrowing at the city and county level. The decisions holding that further voter approval was required did not require that a statewide election be held to obtain such approval.

[32] Constitution of Washington, Amendment 7, subparagraph (c).

The Michigan Constitution contains no such limitation on the power of the Legislature. To the contrary, it specifically provides that laws adopted by the people pursuant to the initiative may be amended or repealed by the vote of three-fourths of the members elected to and serving in each house of the Legislature, and that laws approved on a referendary vote of the people may be amended by the Legislature at any subsequent session.[33]

The constitution does not state whether long-term borrowing legislation submitted to the voters pursuant to § 15 may be amended by the Legislature without a vote of the people. The section of the Michigan Constitution (art 4, § 34) stating that the Legislature may provide that a bill will not become law unless approved by a majority of the electors[34] likewise does not state whether the Legislature has the power of amendment without a further vote of the people. It would seem, however, that the Legislature should have no less a power of amendment in respect to legislation that it chooses to submit to the voters than the power expressly conferred by the constitution in respect to legislation required (because the requisite number of registered electors have signed a petition invoking the referendum) to be submitted.

The structure of this state's constitution appears to be consistent with the general rule prevailing in other jurisdictions that voter-approved legislation may be amended by the Legislature, subject to the super-majority limitation applicable to laws initiated by the people.

## C
### The power of the Legislature to amend or repeal

[33] Const 1963, art 2, § 9.
[34] See fn 31.

voter-approved legislation is, nevertheless, subject
to express constitutional limitations,[35] as well as to
those implicit in express limitations. The Legisla-
ture does not, to be sure, have the same plenary
power with respect to legislation authorizing long-
term borrowing that it has with respect to other
legislation that may be submitted for voter ap-
proval. In contrast with most legislation that may
be the subject of a vote of the people, the people
must respond affirmatively to the three-part ques-
tion required to be propounded pursuant to § 15
before legislation providing for long-term borrow-
ing may be implemented.

A constitutional limitation may be inferred to
enforce or implement the purpose and spirit of an
explicit constitutional limitation. Although § 15 is
silent with respect to whether an act providing for
long-term borrowing may be amended without a
vote of the people, it is implicit that it may not be
amended in respect to the three particulars
(amount, specific purpose, and method of repay-
ment) expressly required to be stated in the ballot
question. Any other construction of § 15 would
permit the Legislature to do indirectly what it
could not do directly without a vote of the people.
Accordingly, provisions of an act providing for
long-term borrowing stating the amount to be
borrowed, the specific purpose to which the funds
shall be devoted, and the method of repayment
may not be amended without an approving vote by
the people.

Inferring a constitutional limitation requiring
an approving vote by the people of an amendment
respecting the interest rate of a long-term borrow-
ing act—not required to be set forth in the act or

[35] See *Cottingham v State Board of Examiners*, 134 Mont 1, 13; 328
P2d 907 (1958), *overruled on other grounds State ex rel Ward v
Anderson*, 158 Mont 279; 491 P2d 868 (1971).

the ballot question—would not prevent the Legislature from doing indirectly what it cannot do directly, but rather would prevent the Legislature from doing directly what it can constitutionally do indirectly.

The opinion of the justices advising that Act 47 is unconstitutional states, and we agree, that "[t]he Legislature might have enacted a bill without a set interest rate".[36] If Act 76 had been enacted without a set interest rate, the Legislature could then, without voter approval, have set or provided for setting the interest rate, as was done under the 1908 Constitution.[37]

The Legislature, consistent with § 15, could approve a long-term borrowing act stating no more than the three particulars that are required by § 15 to be set forth in a ballot question (amount, specific purpose, and method of repayment). Before or after approval of such an act by the voters, the Legislature could, without voter approval, "implement" such act by providing in a separate act for the interest rate and other particulars not required by § 15 to be set forth in the ballot question. (After the voters responded affirmatively to the ballot question on Act 76, that act was "implemented" by 1969 PA 21[38] and 1969 PA 159.[39]) An advisory opinion or decision that would infer a

---

[36] *Post,* p 92.

[37] See fn 14.

[38] Amending 1966 PA 329, MCL 323.111 *et seq.;* MSA 3.533(51) *et seq.*

[39] MCL 323.401 *et seq.;* MSA 5.2769(401) *et seq.*

The title of both Act 329 as amended (fn 38) and Act 159 concluded with: "and to implement Act No. 76 of the Public Acts of 1968".

The Legislature has similarly found it necessary to implement other long-term bond legislation. See, *e.g.,* 1974 PA 370, MCL 35.1021 *et seq.;* MSA 4.1097(41) *et seq.,* approved with immediate effect December 23, 1974, implementing 1974 PA 106, MCL 35.1001 *et seq.;* MSA 4.1097(21) *et seq.,* a long-term borrowing act approved by the people on November 5, 1974.

constitutional limitation that may be readily by-passed (by enacting the three-part question in one act and other particulars of the legislation in a concurrent or subsequent "implementing" act) would not serve to enforce or implement the purpose or spirit of § 15, but would simply encumber the legislative process.

No interest of the people secured by § 15 would be protected by inferring a constitutional limitation concerning features of long-term borrowing legislation not required by § 15 to be submitted to and approved by the voters. A constitutional limitation barring the Legislature from doing directly what it may constitutionally do indirectly should not be inferred.

The rule is not that "[u]nder the debt-control limitations of the constitution, the Legislature, by itself, cannot change that which the voters have approved". The rule—consistent with the general rule that the Legislature may amend voter-approved legislation, with § 15, and with the other provisions of the Michigan Constitution concerning initiative and referendum—is that the Legislature (i) is not empowered without voter approval to amend a legislative provision that it cannot enact without voter approval, and (ii) is empowered without voter approval to amend a legislative provision that it can enact without voter approval although such provision may have been submitted to a vote of the people.

We advise that the provision of Act 76 concerning the interest rate may be amended as provided in Act 47 without a vote of the people.

## IV

The opinion of the justices advising that Act 47

is unconstitutional seems to suggest that because a long-term borrowing act serves the function formerly served under the 1908 Constitution by a constitutional amendment authorizing long-term borrowing, such an act is subject to amendment "the same" as if it were a constitutional amendment and thus cannot be amended except by a vote of the people.[40] That argument ignores that a purpose of § 15 was to eliminate from the constitution the details of long-term borrowing. The statement in the official convention comment that "the voting is * * * *the same* as * * * for a constitutional amendment"[41] (emphasis supplied) simply refers to "two-thirds of the members" and "a majority of the electors".

Although a long-term borrowing act cannot become effective unless there is an affirmative vote on the ballot question, such an act does not, upon a favorable vote, become a constitutional amendment. Nor does such an act have the status of a constitutional amendment. To advise that a long-term borrowing act has the status of, or in effect is, a constitutional amendment and therefore can only be amended by the same process applicable to constitutional amendments is to reintroduce the very rigidity that § 15 was designed to avoid.

## V

Although the opinion of the justices advising that Act 47 is unconstitutional intimates that the phrase "amount to be borrowed" in § 15 may include the interest or the rate of interest,[42] that would be inconsistent with the opinion's statement

---

[40] *Post,* p 87.

[41] 2 Official Record, Constitutional Convention 1961, p 3401.

[42] *Post,* p 88, fn 9.

that "[t]he Legislature might have enacted a bill without a set interest rate".[43] We would not intimate that "the amount to be borrowed" or "the method of repayment" contemplates inclusion of the interest or the rate of interest and thereby both (i) put in doubt the validity of bonds (including the $302 million of bonds already issued pursuant to Act 76) that have been issued since the adoption of the 1963 Constitution pursuant to ballot questions that did not mention interest, and (ii) suggest that in the future a ballot question should contain a statement regarding the interest or the rate of interest.

The "amount to be borrowed" in the instant case was, as stated in the ballot question, $335 million, and did not include the interest that the state obligated itself to pay on the principal amount borrowed. Nor is the interest rate an "amount to be borrowed". The term "method of repayment" refers, in general, to the source of repayment; in the instant case, as set forth in the ballot question, that source is the "general fund of the state".

The characterization, in the opinion of the justices advising that Act 47 is unconstitutional, of that act as a "new debt authorization"[44] is, again, inconsistent with the statement that "[t]he Legislature might have enacted a bill without a set interest rate". If a *change* in a stated interest rate is a "new debt authorization", then the *establishment* of an interest rate where none has been stated would also seem to be a new debt authorization. If the establishment of an interest rate is itself a new debt authorization that the people must approve pursuant to § 15, the Legislature

[43] *Post*, p 92.

[44] *Post*, p 87.

cannot enact a long-term borrowing act which does not set the interest rate. Moreover, the "new debt authorization" characterization begs the question. An amendment of an interest rate may as readily be characterized as a change in an old debt authorization as a new debt authorization.

## VI

None of the constitutional amendments providing for long-term borrowing under the 1908 Constitution prescribed the interest rate, and two amendments did not even prescribe how the interest rate would be set.[45] In the fifty years preceding the 1970's, interest rates moved within a relatively narrow range. Given this history, it is reasonable to conclude that the drafters of the 1963 Constitution did not foresee an exponential rise in interest rates and therefore did not require voter approval of the interest rate. The interest rate was not one of the particulars required to be stated in a § 15 ballot question.

After the drafting and adoption of the 1963 Constitution, there was a major change in the bond market, and interest rates have risen significantly. Interest rates can now be quite volatile, and the interest cost of a bond issue is now a much more significant factor than it was in the years preceding the drafting and adoption of the 1963 Constitution.

Some may, therefore, think that the people should approve the interest rate or any change or increase in the burden of the interest rate.[46] This

[45] See fns 13 and 14.

[46] That indeed is an underlying thesis of the opinion of the Supreme Court of Virginia in *Miller v Ayres,* 211 Va 69, 77; 175 SE2d 253 (1970):

"A taxpayer, to make an intelligent and considered judgment, first

can, however, only properly and effectively be accomplished by a constitutional amendment reserving to the people the power to approve the interest rate along with the other three particulars set forth in § 15 (amount, specific purpose, and method of repayment).

A decision of this Court that bars the marketing of the remaining $33 million of water pollution bonds because an interest rate was prescribed in Act 76 will not protect the people from legislative change in interest rates except in the instant case. In the future, the Legislature may, by not having prescribed an interest rate when long-term bond legislation is submitted to the voters pursuant to § 15, avoid any inhibition on its power to set interest rates.

A decision advising that Act 76 is unconstitutional may thus serve only to preclude the marketing of the remaining $33 million of water pollution bonds and to introduce into the jurisprudence concepts that are inconsistent with the spirit of the Michigan Constitution and that may be seen as inhibiting legislative power in respect to voter-approved legislation in other areas not dealt with or anticipated at this time.

## VII

In conclusion, § 15 does not require that the ballot question state an interest rate. Inferring a

must determine whether the project is necessary, and whether he wishes his county or city to go into debt to finance it. The amount and maturity of the debt are important and have bearing on the cost of the undertaking and over how many years the burden of repayment is to be spread. Of equal importance is the interest, or cost of the money to finance the project. The law is designed to assure that a voter has available the information needed to make a decision which could result in an increase of his tax burden."

Section 15 of the Michigan Constitution, in contrast with the Virginia Constitution, prescribes the form of the ballot question.

constitutional limitation requiring voter approval of a legislative amendment of a provision that was not required to be submitted to a vote of the people on the debatable premise that it was submitted to such a vote would be inconsistent with the well-established general rule that the Legislature may without a vote of the people amend voter-approved legislation. Inferring such a constitutional limitation would not implement or enforce the purpose and spirit of § 15, but would simply encumber the legislative process.

We advise that Act 47 is constitutional.

KAVANAGH, CAVANAGH, and BOYLE, JJ., concurred with LEVIN, J.

WILLIAMS, C.J.

INTRODUCTION

We have been asked by the Legislature and former Governor Milliken to render an advisory opinion regarding the following question:

May the state issue up to $33,000,000 of general obligation bonds at a rate of interest higher than the 6% authorized by 1968 PA 76?[1]

---

[1] The request for an advisory opinion on the constitutionality of 1982 PA 47 was originally denied. However, former Governor Milliken's motion for reconsideration was granted and the Court decided, upon reconsideration, to grant the request for an advisory opinion. The Attorney General was requested to brief and argue both sides of the question.

There was an attempt in 1981 to make the bonds marketable by amending the interest rate provision to state: "to bear interest at such rate or rates, not to exceed the maximum rate permitted by Act No. 202 of the Public Acts of 1943, as amended, being sections 131.1 to 138.2 of the Michigan Compiled Laws". 1981 PA 69, MCL 323.374; MSA 5.2769(204). The amendment was immediately effective on June 18, 1982. This amendment did not result in the issuance of any bonds, however, and is not the subject of this advisory opinion.

1982 PA 47 was an attempt by the Legislature to amend, without voter approval, a prior act, 1968 PA 76, MCL 323.371 *et seq.;* MSA 5.2769(201) *et seq.,* which was *approved by the voters* as prescribed by Const 1963, art 9, § 15.[2] 1968 PA 76 authorized a bond issue for the prevention and abatement of water pollution at a maximum rate of interest of 6% per annum. The effect of 1982 PA 47 would be to increase, by legislative enactment alone, *without voter approval,* the maximum rate of interest from 6% per annum to 18% per annum.

The issue presented is whether 1982 PA 47, enacted without voter approval, can authorize the state to issue the remainder of the general obligation bonds authorized by the voters in 1968 PA 76 at an interest rate higher than the 6% maximum provided by the original authorization. We are of the opinion that amendment of 1968 PA 76 by 1982 PA 47 is unconstitutional for lack of approval by the voters as required by art 9, § 15, of the 1963 Constitution.[3]

We have been aided in the consideration of this matter by the Attorney General who has submitted one brief in support of the conclusion of constitutionality, and one brief in support of the conclusion of unconstitutionality, and by the briefs filed by amici curiae, supporting the conclusion of con-

[2] Const 1963, art 9, § 15 provides:

"The state may borrow money for specific purposes in amounts as may be provided by acts of the legislature adopted by a vote of two-thirds of the members elected to and serving in each house, and approved by a majority of the electors voting thereon at any general election. The question submitted to the electors shall state the amount to be borrowed, the specific purpose to which the funds shall be devoted, and the method of repayment."

The Court held in *Schureman v State Highway Comm,* 377 Mich 609; 141 NW2d 62 (1966), that art 9, § 15 applied only to general obligation bonds of the state.

[3] For the text of Const 1963, art 9, § 15, see fn 2.

stitutionality. The briefs were thoughtfully and well reasoned, and we are grateful for this assistance.

## I. FACTS

At the general election held on November 5, 1968, the electors approved 1968 PA 76.[4] This act authorized the issuance of general obligation bonds "for the planning, acquisition and construction of facilities for the prevention and abatement of water pollution and for the making of grants, loans and advances to municipalities of the state for such purposes". The voters authorized long-term borrowing in the amount of $335 million for this purpose (§ 3) with the bonds to bear an interest rate not to exceed 6% per annum (§ 4).

1968 PA 76 set forth some of the details of the bond issue. Section 4 confers on the State Administrative Board certain duties with respect to the bond issue and states that the Municipal Finance Commission shall approve the bonds prior to their issuance. Section 8 states the question to be submitted to the electorate pursuant to Const 1963, art 9, § 15. Section 9 states that the Secretary of State shall take the necessary steps to properly submit the question to the electors. Sections 11 and 12 state that no bonds may be issued nor will the act become finally effective until the question is approved by a majority of the voters in the 1968 general election.

Pursuant to § 9 of 1968 PA 76 and the Michigan Election Law, MCL 168.1 *et seq.;* MSA 6.1001 *et*

---

[4] At the same general election, the voters approved 1968 PA 257 which authorized the issuance of general obligation bonds for public recreation purposes. 1969-1970 Michigan Manual, p 497. This act provided that the state could borrow $100 million for this purpose. Section 4 contained a 6% interest ceiling on the bonds similar to that contained in 1968 PA 76.

*seq.,*[5] the Secretary of State certified the question to be submitted to the electorate. The proposal that appeared in the ballot was exactly as set forth in 1968 PA 76, other than the heading. It appeared as follows:

"PROPOSAL NO. 3

"REFERENDUM ON ACT 76 OF THE PUBLIC ACTS OF 1968

(PROPOSAL RELATING TO BONDING TO ABATE WATER POLLUTION)

"Shall the state of Michigan borrow the sum of $335,000,000.00 and issue general obligation bonds of the state therefor pledging the full faith and credit of the state for the payment of principal and interest thereon for the purpose of planning, acquiring and constructing facilities for the prevention and abatement of water pollution and for the making of grants, loans and advances to municipalities, political subdivisions and agencies of the state for such purposes, the method of repayment of said bonds to be from the general fund of the state?

"YES

"No"

The Secretary of State, as prescribed by 1968 PA

[5] The pertinent provision of the Michigan Election Law is MCL 168.480; MSA 6.1480:

"Whenever a proposed constitutional amendment or other special question is to be submitted to the electors of the state for a popular vote, the secretary of state shall, not less than 49 days before the election, certify the same to the clerk of each county in the state, together with the form in which such amendment or other special questions shall be submitted. The secretary of state shall also furnish the several county clerks in the state 2 copies of the text of each amendment or question and 2 copies of each said statement for each voting precinct in their respective counties. The county clerk shall furnish the said copies of such statement to the several township and city clerks in his county at the time other supplies for the election are furnished; and each such township or city clerk shall, before the opening of the polls on election day, deliver the copies of such text and statement to which each voting precinct in his township or city is entitled to the board of election inspectors of said precinct, who shall post the same in conspicuous places in the room where such election is held."

76, § 9, and MCL 168.480; MSA 6.1480, published the entire text of 1968 PA 76 and mailed two copies of the text to each county clerk to be posted at the voting precincts. The act was thereafter posted at the polling places. 1968 PA 76, authorizing the issuance of bonds at the maximum interest rate of 6% to deal with water pollution problems, was overwhelmingly approved by the voters on November 5, 1968. 1969-1970 Michigan Manual, p 496.

Pursuant to the bond authorization approved by the voters, the state borrowed $302 million by the end of 1972. Because of market forces, however, the state is unable to sell the remaining bonds bearing an interest rate of 6%. Therefore, on March 19, 1982, the Legislature enacted 1982 PA 47 which purported to amend 1968 PA 76 by increasing the maximum rate of interest from 6% to 18%. The purpose of this legislation is to make the bonds marketable and, thus, carry out the purposes of the earlier act, *i.e.,* the abatement and prevention of water pollution. The amendment was not submitted to the electorate for approval pursuant to Const 1963, art 9, § 15, as was the original long-term borrowing act.

The Legislature and former Governor Milliken requested an advisory opinion as to the constitutionality of 1982 PA 47. The basic issue is whether the state may issue the remainder of the general obligation bonds authorized by the voters in 1968 PA 76 at an interest rate higher than the 6% maximum provided by the original authorization, although the increase in interest rate was not approved by the people.

## II. CONSTITUTIONAL PRINCIPLES

As stated in *Advisory Opinion on Constitutional-*

*ity of 1976 PA 240,* 400 Mich 311, 317-318; 254
NW2d 544 (1977):

> "The Michigan Constitution is not a grant of power to
> the Legislature as is the United States Constitution, but
> rather, it is a limitation on general legislative power. *In
> re Brewster Street Housing Site,* 291 Mich 313; 289 NW
> 493 (1939). Unless the Constitution contains limitations,
> the Legislature has general power to contract."

Acts of the Legislature are presumed constitu-
tional unless such legislation manifestly infringes
upon some provision of the constitution. *Johnson v
Comm'r of Agriculture,* 314 Mich 548, 557; 22
NW2d 893 (1946). In this case, we must analyze
Const 1963, art 9, § 15, and determine whether
this constitutional limitation on long-term borrow-
ing precludes the Legislature from amending with-
out approval of the people a prior bond authoriza-
tion that was approved by the people.

In deciding the constitutionality of 1982 PA 47,
it is important to note the limited power of the
State of Michigan to borrow money. Article 9, § 12,
states:

> "No evidence of state indebtedness shall be issued
> except for debts authorized pursuant to this constitu-
> tion."

This provision is clear. Only as authorized by
constitutional provision may the state borrow
money.[6]

---

[6] The Constitution of 1963 provides four specific instances in which
the state is permitted to borrow:

1) Const 1963, art 9, § 14, provides for short-term borrowing to meet
current appropriations.

2) Const 1963, art 9, § 15, provides for long-term borrowing if
adopted by 2/3 of the Legislature and approved by the electorate.

3) Const 1963, art 9, § 16, provides for the making of loans to school
districts.

The only constitutional provision applicable in this case, art 9, § 15, states:

"The state may borrow money for specific purposes in amounts as may be provided by acts of the legislature adopted by a vote of two-thirds of the members elected to and serving in each house, and approved by a majority of the electors voting thereon at any general election. The question submitted to the electors shall state the amount to be borrowed, the specific purpose to which the funds shall be devoted, and the method of repayment."

The import of art 9, § 12 and art 9, § 15 taken together is quite clear. "No evidence of state indebtedness shall be issued except for debts authorized pursuant to this constitution." Article 9, § 12. The only long-term debts, such as the instant debts, authorized by the constitution are those authorized by the process established by art 9, § 15, *i.e.*, by "acts of the legislature adopted by a vote of two-thirds of the members elected to and serving in each house, and approved by a majority of the electors voting thereon at any general election". There is nothing anywhere in the constitution authorizing the issuance of state indebtedness under art 9, § 12 by legislative amendments without vote of the people of acts adopted pursuant to art 9, § 15. The Legislature is not allowed to incur long-term debt without prior approval of the people. *Advisory Opinion on Constitutionality of 1975 PA 301,* 400 Mich 270, 302-303; 254 NW2d 528 (1977).

## III. GENERAL CONSTITUTIONAL ANALYSIS

This brings us to the issue raised by the Gover-

---

4) Const 1963, schedule and temporary provisions, § 14, provides for the retirement of Mackinac Bridge bonds.

nor and the Legislature in this case. Granted that the Legislature cannot incur long-term debt without a vote of the people, does art 9, § 15, allow the Legislature, without a vote of the people, to amend a prior long-term debt authorization of the people by altering the maximum interest rate from 6% to 18%?

In construing art 9, § 12 and art 9, § 15, we apply the basic rule as set forth in *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971):

> "The primary rule is the rule of 'common understanding' described by Justice COOLEY:
>
> " 'A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed." (Cooley's Const Lim 81).' [As quoted in *May v Topping,* 65 W Va 656, 660; 64 SE 848 (1909).]
>
> * * *
>
> "A second rule is that to clarify meaning, the circumstances surrounding the adoption of a constitutional provision *and the purpose sought to be accomplished* may be considered. On this point this Court said the following:
>
> " 'In construing constitutional provisions where the meaning may be questioned, the court should have regard to the circumstances leading to their adoption and the *purpose* sought to be accomplished.' *Kearney v Board of State Auditors,* 189 Mich 666, 673; 155 NW 510 (1915)." (Emphasis added.)

It is clear beyond peradventure that the common understanding of the people was that the combination of art 9, § 12 and art 9, § 15, is a limitation on legislative authority to enact borrowing statutes without approval of the electorate.

Prior to the 1963 Constitution, the 1908 Constitution, art 10, § 10, provided debt limitations as follows:

"The State may contract debts to meet deficits in revenue, but such debts shall not in the aggregate at any time, exceed two hundred fifty thousand dollars. The State may also contract debts to repel invasion, suppress insurrection, defend the State or aid the United States in time of war. The money so raised shall be applied to the purposes for which it is raised or to the payment of the debts contracted."

Thus, in order to engage in any other long-term borrowing, the 1908 Constitution required a constitutional amendment for each borrowing. This process "cluttered up" the constitution. This particular provision was amended nine times to allow long-term borrowing.[7]

Dissatisfaction with the procedure required by the provisions of the 1908 Constitution resulted in art 9, § 15, of the 1963 Constitution. As stated by the convention in its official comment:

"This is a new section dealing with long-term borrowing such as we used when we paid bonuses to the veterans of three wars; when we borrowed for hospital construction; and when in the decade of the twenties, we borrowed on full faith and credit for highway construction. The *legislature is not empowered to authorize any such borrowing without the approval of the voters of the state,* but this section provides a method that can

_____

[7] See Michigan Constitutional Convention Studies, Preparatory Commission (Sept, 1961), Report No 17, Table IV, pp 42-49.

be used without cluttering up the constitution with amendments authorizing the borrowing, as we have had to do in the past.

"The voting will be the same, a two-thirds vote in both houses of the legislature on a bill, but the bill will not be effective unless and until approved by a majority of the people who vote on the proposition. *The voting is, therefore, the same as that under the present constitution for a constitutional amendment,* but it avoids the necessity of amending the constitution." (Emphasis added.) 2 Official Record, Constitutional Convention 1961, p 3401.

In essence, the principle of requiring voter approval before the state can engage in long-term borrowing was not altered by the 1963 Constitution. Just as the amendment process under the 1908 Constitution[8] required a 2/3 vote of the members of each house and a majority of the electorate voting on the amendment, so does art 9, § 15, of the 1963 Constitution require a 2/3 vote in both houses and approval by a majority of the electorate voting thereon. The only difference between the two procedures is that today a constitutional amendment is no longer needed. But approval of such legislative enactment requires approval of a majority of the voters for the proposed bond authorization to become law, just as a constitutional amendment does.

---

[8] Article 17, § 1 of the 1908 Constitution provided:

"Any amendment or amendments to this constitution may be proposed in the senate or house of representatives. If the same shall be agreed to by two-thirds of the members elected to each house, such amendment or amendments shall be entered on the journals, respectively, with the yeas and nays taken thereon; and the same shall be submitted to the electors at the next spring or autumn election thereafter, as the legislature shall direct; and, if a majority of electors qualified to vote for members of the legislature voting thereon shall ratify and approve such amendment or amendments, the same shall become part of the constitution."

Fundamental analysis of the purpose of art 9, § 12, the debt-limitation provision, art 9, § 15, the borrowing provision, and the 1963 Constitutional Convention Official Comment makes it abundantly clear that the people, in their constitution, (1) limited the state's ability to incur debt to only such ways as provided by the constitution, (2) the only way to incur long-term debt provided by the constitution is by a 2/3 vote of the Legislature and approval of the people, and (3) voting under the 1963 Constitution is "the same * * * as * * * for a constitutional amendment". Under such analysis, it is clear for two reasons that the 1968 PA 76 debt authorization could not be amended by the 1982 PA 47 legislative action alone.

First, 1982 PA 47 is, in effect, an attempted new debt authorization. It was recognized that because of market conditions 1968 PA 76 was no longer an effective debt authorization. At 6%, evidences of debt would not sell. In order to have an effective debt instrument, a new authorization was necessary. That was what 1982 PA 47 attempted to accomplish. But art 9, § 15, requires that a debt authorization not only be approved by 2/3 of the Legislature, but by a majority vote of the people. 1982 PA 47 was not so approved; therefore, it is not a valid debt authorization.

Second, the history of the 1963 Constitutional Convention and the convention comment indicate that, while the debt authorization instrument under art 9, § 15, is not a constitutional amendment, "[t]he voting is * * * the same as * * * for a constitutional amendment". If the voting is the same as for a constitutional amendment, it would not illogically suggest that any amendments of the debt authorization instrument would likewise be approved by voters as for a constitutional amend-

ment. 1982 PA 47 was not approved as for a constitutional amendment. Therefore, it is invalid.

## IV. Specific Constitutional Analysis

Just as consideration of the fundamental principles leads to the conclusion that 1982 PA 47 is invalid, critical analysis of the specific language of art 9, § 15, reaches the same conclusion. Such critical analysis requires that we consider exactly what the voters approved in the 1968 election.

The Attorney General in his brief in support of the constitutionality of 1982 PA 47 and amici curiae rely heavily on the second sentence of art 9, § 15, which states:

"The question submitted to the electors shall state the amount to be borrowed, the specific purpose to which the funds shall be devoted, and the method of repayment."

Thus, they argue that the electorate does not approve the entire act, but merely the amount to be borrowed, the specific purpose to which the funds shall be devoted, and the method of repayment. In 1968, according to them, the voters did not approve 1968 PA 76 which included the 6% interest ceiling, but instead merely approved the general question submitted on the ballot.[9] The Legislature is, therefore, they believe, free to amend the prior act and raise the interest ceiling

_____

[9] We do not consider in this opinion the very pertinent question whether either "the amount to be borrowed" or "the method of repayment" contemplates inclusion of the rate of interest to be paid. Obviously "the amount to be borrowed" at 6% is a very different thing from "the amount to be borrowed" at 18%, as would be "method of repayment". However, since the resolution of this matter appears to us so clear from the other arguments discussed in the opinion, we do not elaborate on this point.

in the bonds to 18%. We do not agree with this argument.

The Attorney General, in his brief in support of constitutionality, and amici curiae fail to analyze the whole constitutional provision. Analysis of the whole provision shows that the people approved the whole of 1968 PA 76, not merely the provisions set forth in the ballot question, and that it is the act, not the question, that authorizes the borrowing.

First, by setting up the constitution in its component parts, it is perfectly clear that the whole act is approved by the people. The constitution specifically states that:

The state may borrow money for specific purposes in amounts as may be provided by acts of the legislature

(a) adopted by a vote of two-thirds of the members elected to and serving in each house; and

(b) approved by a majority of the electors voting thereon at any general election.

In question are the "acts of the legislature" (a) *"adopted by a vote of two-thirds"* of the Legislature *and* (b) *"approved by a majority of the electors voting thereon"*. The people, like the Legislature, approve not a part of, but the whole *act.* While the second sentence states specifically what the question put to the people must contain, the first sentence equally plainly states that the *"acts of the legislature"* are what the electorate approves. More importantly, "[t]he state may borrow money for specific purposes in amounts as may be provided by [such] acts" and only as so provided.

Secondly, the convention comment notes that the *bill* will not be effective unless and until approved by a majority of the people who vote on the proposition as follows:

"The voting will be the same, a two-thirds vote in both houses of the legislature on a bill, but the *bill will not be effective unless and until approved by a majority of the people* who vote on the proposition. The voting is, therefore, the same as that under the present constitution for a constitutional amendment, but it avoids the necessity of amending the constitution." (Emphasis added.) 2 Official Record, Constitutional Convention 1961, p 3401.

Just as the amendment to the constitution had to be approved by the electorate, so too the act authorizing the long-term borrowing must be approved by the electorate.

Third, the second sentence dealing with the question to be submitted merely specifies the information that must be placed on the ballot. Obviously, it would not be practical or efficient to include the entire act on the ballot. The main objective of the question on the ballot is to generally apprise the voters of the subject matter. It need not contain all the details. See MCL 168.643a; MSA 6.1643(1).[10]

While we are not unaware that the interest rate was not specifically set forth in the ballot question presented to the electorate, it definitely is part of 1968 PA 76, and that is what the voters were

---

[10] MCL 168.643a; MSA 6.1643(1) states:

"Any question submitted to the electors of this state or the electors of any subdivision of this state shall, to the extent that it will not confuse the electorate, be worded in the following manner: A 'yes' vote will be a vote in favor of the subject matter of the proposal or issue, and a 'no' vote will be a vote against the subject matter of the proposal or issue. Questions shall be worded so as to apprise the voters of the subject matter of the proposal or issue, but need not be legally precise. The language used shall create no prejudice for or against the issue or proposal."

Furthermore, with regard to constitutional amendments, we have emphasized the importance of informing the electorate but at the same time not confusing it. *Pontiac School Dist v City of Pontiac,* 262 Mich 338, 344; 247 NW 474; 247 NW 787 (1933).

approving. 1968 PA 76 specifically states the interest rate in § 4 as follows:

"The bonds shall be issued in 1 or more series, each series to be in such principal amount, to be dated, to have such maturities which may be either serial, term or term and serial, to bear interest at such rate or rates *not exceeding 6% per annum* * * *." MCL 323.374; MSA 5.2769(204).

See discussion, *supra.* The electorate is presumed to have knowledge of the act from which the ballot question is derived. See *Louthan v King County,* 94 Wash 2d 422; 617 P2d 977 (1980); *Miller v Ayres,* 211 Va 69; 175 SE2d 253 (1970).[11] It cannot be said that the public is indifferent to the interest rate or that it is insignificant in terms of authorizing long-term borrowing.[12] It is part of the total cost of the project, whether it be for abatement of water pollution or construction of a stadium, and is of utmost importance to any taxpayer. See *Alan v Wayne County,* 388 Mich 210, 341-342; 200 NW2d 628 (1972); *Kratchman v Detroit,* 400 Mich 158, 167; 254 NW2d 23 (1977).

We are not necessarily saying that art 9, § 15, requires every act authorizing long-term borrow-

---

[11] In *Louthan,* the Supreme Court of Washington held that without further authorization from the voters, general obligation bonds could not be issued at a greater maximum rate than 8%, the rate provided by statute when the initial bond ordinance was approved by the voters. In *Miller,* the Supreme Court of Appeals of Virginia also held that bonds could not be issued and sold at a greater interest rate than that provided by the statute in effect at the time of the initial voter approval. The electors were presumed to have knowledge of the underlying statutes, and the fact that the interest rate was not placed on the ballot was found to be immaterial.

[12] That interest rates are important has always been, and today particularly is, elementary. Economists and politicians advert to this truism constantly. Automobile dealers, real estate operators and consumers, among others, understand only too well that it is not only the ticket price but the interest cost that makes or breaks the possibility of sales.

ing to contain a set interest rate. In fact, several of
the attempts by the Legislature to invoke the
provisions of art 9, § 15, provided that the State
Administrative Board would set the interest rate
that the bonds would bear. *It is interesting to note,
however, that of the six proposals submitted to the
people as prescribed by art 9, § 15, all three of the
defeated proposals had no set interest rate.*[13] The
only one of the adopted proposals that provided for
the board to set the interest rate was the bond
issuance to provide a service bonus for veterans of
Vietnam and other conflicts.[14] The interest rate, it
would seem, is obviously a significant factor to the
electorate.

We are not presented in this case, however, with
a proposal that left the authority to set the maxi-
mum interest rate up to the State Administrative
Board, but rather with an act that specifically set
the interest rate at 6%. The Legislature might
have enacted a bill without a set interest rate.[15] It,

[13] The following proposals for long-term borrowing were not ap-
proved by the electorate: 1969 PA 304, 1972 PA 231, and 1974 PA
245. See 1971-1972 Michigan Manual, p 520, 1973-1974 Michigan
Manual, p 560, and 1975-1976 Michigan Manual, p 570.

[14] 1974 PA 106, MCL 35.1001 *et seq.;* MSA 4.1097(21) *et seq.;* 1975-
1976 Michigan Manual, p 568.

[15] Amici curiae argue that the Legislature could have passed two
separate bills: one authorizing the borrowing and referring the ques-
tion to the voter and the other implementing such legislation. The
second act then could have voluntarily been referred to the voters as
prescribed by art 4, § 34. The provisions could be amended later
without resubmission to the voters. *Dykstra v Holden,* 151 Mich 289;
115 NW 74 (1908).

This argument seems to go against the position in favor of the
constitutionality of 1982 PA 47 because in fact the Legislature did not
pass two separate acts. It instead *chose* to set forth in one bill all of
the necessary information pertaining to the long-term borrowing
proposition. That bill *had* to be submitted to the electorate for
approval as prescribed by art 9, § 15. Everything was set forth in the
act, including the interest rate, and that is what the electorate
approved. Likewise, the concept that 1968 PA 76 can be considered as
two separate acts is unacceptable, because 1968 PA 76 was adopted as
a whole act under art 9, § 15, and was not submitted to the voters as
prescribed by art 4, § 34.

however, did not choose this alternative. Instead, it passed an act authorizing a bond issuance with a specific interest ceiling of 6%. If the Legislature had not specified an interest ceiling, it is quite possible 1968 PA 76 might have been defeated by the people as were 1969 PA 304, 1972 PA 231, and 1974 PA 245 which did not fix interest ceilings.

## V. CONCLUSION

We are well aware of the financial condition being faced by the state and its municipalities and of the need to issue general obligation bonds at a marketable rate to continue the much-needed cleanup of one of this state's greatest resources—its waters. It is our opinion, however, that art 9, § 15, of the 1963 Constitution requires that any amendment of a voter-approved long-term borrowing authorization must be submitted to the electorate. The people, in ratifying the 1963 Constitution, clearly wanted the ability to control long-term borrowing. To allow the Legislature to unilaterally amend the interest rate in a voter-approved bond authorization from 6% to 18% certainly challenges the people's constitutional control over long-term borrowing. In 1968, the electorate authorized issuance of $335 million in general obligation bonds at an interest rate of 6%. Under the debt-control limitations of the constitution, the Legislature, by itself, cannot change that which the voters have approved.[16] We are of the opinion that 1982 PA 47 is unconstitutional.

---

[16] In his opinion, Justice LEVIN argues that "[a]n act of the Legislature approved by the voters is, however, generally regarded as subject to amendment by the Legislature without a vote of the people" [ante, p 65]. Vote of the people is not required under art 2, § 9, ¶ 5 or art 4, § 29 of the Michigan Constitution. But in each case such amendment without a vote of the people is authorized only for acts adopted under those sections of the constitution. There is no provision authorizing amendment of art 9, § 15 enactments by the Legislature without a vote of the people. Since specific permission is included in the other

RYAN and BRICKLEY, JJ., concurred with WILLIAMS, C.J.

---

two sections, absence of such provision in art 9, § 15 could be considered noteworthy. However, the most significant fact is that the combination of art 9, § 12 and art 9, § 15 precludes issuance of evidence of debt except by the procedure specified in art 9, § 15, which requires a vote of the people. It is with this in mind that the sentence in the text to which note 16 refers was written, *viz.*, "*[u]nder the debt-control limitations of the constitution,* the Legislature, by itself, cannot change that which the voters have approved".